Wanamaker, J.,
dissenting.
The majority decision, boiled down, holds that the council of Cleveland, under the constitutional amendments of 1912 and under the new charter made pursuant thereto, has no legal right or power to fix telephone rates. for the city of Cleveland. That, hereafter, is to be done by a state commission, pursuant to a state statute.
CONSEQUENCES OF THIS JUDGMENT.
What, now, are the legal and logical consequences of the doctrine announced in this decision ?
The people are responsible for the consequences resulting from the plain provisions of their own state constitution; it is their act. The courts are responsible for the consequences of their construction of doubtful provisions of the constitution, because it is the court’s act.
If a state commission may regulate telephone rates for a municipality and its inhabitants, in the exercise of the state’s police power, it may regulate telephone companies in all respects in their municipal operation. This same doctrine must of *388 course be carried and applied to water, heat, light, and transportation companies, indeed to all public utilities serving the necessities, comforts and conveniences for the municipalities of Ohio and their inhabitants.
Whenever and wherever the general assembly desires to exercise its police power over the municipalities of Ohio, it may hereafter do so to the full, without any municipal interference. The general assembly, in the exercise of the same state police power, may under its police power provide for a state police commission, a state fire commission, a state health commission, and every other variety of commission, using the city officers as mere cogs in the state governmental machine by commission.
AUTOCRACY IN OHIO.
This would make the governor of Ohio, who is the appointive power, an actual autocrat over all the cities and villages of Ohio. His power over all cities and villages would be equalled only by the Prussian of Potsdam. The commission, in any given case, could as well be one man as two, three, or more. This one man could control the utilities for the three million people of the cities against their will and without consulting their welfare.
The people would have no voice in the choice of the commission; they would have no control over its official orders, no right of referendum on its official action, and no right of review save to the supreme court, a body that necessarily cannot be as fully informed of local conditions in each separate city as the municipal authorities themselves.
*389 When such action as the fixing of rates is done by the city council, it is done by the city’s own officers, elected by them, responsible to them, and removable by them, and in addition thereto, for the further protection of the people, the voters have the right of a referendum on any such ordinance of a city council.
This is pure, practical democracy, while the state commission plan. is pure, practical autocracy. Whatever else we may call it, it is not “government by the consent of the governedit is not “government of the people, by the people and for the people.’31
FUNDAMENTAL PRINCIPLES.
Our Ohio forefathers in 1802 wisely said in their Bill of Rights, Section 18, Article VIII:
“That a recurrence to the fundamental principles of- civil government, is absolutely necessary to preserve the blessings of liberty.”
Let us emulate and apply their wisdom.
A brief history of the constitutional changes by amendment will be not only interesting but illuminating on the question involved in this case.
The Ohio Constitution of 1851 announced the sacred doctrine that “All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary.” Section 2, Article I, Bill of Rights.
Prior to 1910 there had been widespread and deep:seated protest by the people, to the effect that *390 the political powers delegated in the Constitution of 1851 had been unjustly used and politically perverted, resulting in the growth and establishment of intolerable abuses, special privilege, inequality of right and burdens, and that the government of Ohio which was designed to be “government of the people, by the people and for the people” had failed in the accomplishment of its primary and paramount purpose.' Agitation for a new convention, to make a new distribution and delegation of powers, with efficient safeguards, for the protection of the people’s rights and the public welfare, had been going on for years.
It finally culminated in a decisive demand for such constitutional convention by express vote of the people at the regular election of 1910. At this election the question of a new constitutional convention was submitted and was overwhelmingly adopted by the voters of Ohio by the unprecedented vote of 693,263 for to 67,718 against, more than ten votes to one in favor of a new constitution, a new political will, a “new order.”
Every county in Ohio voted overwhelmingly for it, the ten counties containing the ten largest cities of Ohio showed a vote of 381,493 for to 16,812 against, a ratio of more than seventeen votes for to one against.
Forty-one separate proposals adopted by the constitutional convention were submitted to the voters, and thirty-three of them were adopted, most of them by very decisive majorities. For instance, in the ten counties containing the ten largest cities of Ohio, the vote in favor of the home-rule amend *391 ment, Article XVIII, showed a majority of more than 100,000.
All of the foregoing is offered merely for the purpose of showing that the people of Ohio were determined, so far as it lay in their power, to vitally and radically change the “old order,” as declared in the Constitution of 1851, by establishing a “new order,” a new political will of the date of 1912, to promote and protect government by the people.
Now let us make a general survey of these new amendments, in order to ascertain the general plan and purpose in making these changes, as shown by what was said and done.
GENERAL PURPORT AND PURPOSE OF CHIEF CHANGES.
The executive branch of the government had its appointive power radically limited and hedged about by the civil, service amendment.
The judicial branch of the government had its powers definitely and radically limited as to its jurisdiction, as to its right to set aside verdicts as against the weight of the evidence, as to its right to declare statutes unconstitutional, and in other particulars.
The legislative branch of the government was henceforth to be restrained and limited by the right of veto upon every legislative act, save emergency acts and a few other special exceptions, through the right of the popular referendum. The people also declared for themselves the right of the initiative. These two reservations of power, *392 definitely expressed and safeguarded in the constitution, marked the most radical limitation upon the power of the general assembly that has ever been recorded in the history'of Ohio.
The general assembly was substantially deprived of the right to confer jurisdiction upon the court of appeals and the supreme court, the people having expressly prescribed that jurisdiction through constitutional grant made by themselves.
The people withdrew, or tried to withdraw, municipalities from the guardianship of the general assembly of Ohio, and declared in substance that Ohio’s “municipalities are and of right ought to be free and independent in their municipal affairs.1”
Other radical changes along the line of limiting the legislative power of the general assembly might be enumerated, but sufficient has been shown of the general nature of the changes made in the political codicil of 1912 to clearly and unmistakably indicate that the people of Ohio proposed to make ,a new distribution of power, a new delegation of power, to safeguard government “by the people,” through a “new order,” the “new” amendments.
SURVEY OF HOME-RULE AMENDMENT.
Let us now take- a general view of the special home-rule amendment, known as Article XVIII, with particular reference to its restraints and limitations upon the general assembly of Ohio as to its further control and guardianship of Ohio’s municipalities.
*393 This amendment is .composed of fourteen several sections, ninety-five per cent, of it is new matter, which in itself would strongly suggest a purpose to materially and radically change the “old” order. It was submitted to the people of Ohio under the title of “Municipal Home Rule.” Why “Municipal Home Rule ?”
For nearly a half century the cities and villages of Ohio had been in political bondage to the general assembly. Annually, or at least biennially, the political bosses and profiteers, high and low, had through the general assembly made political footballs of the municipalities of Ohio by various kinds of “ripper” legislation. The general assembly had assumed a political guardianship over the cities and villages, which the inhabitants of those municipalities had long and vigorously resented. The people presented their grievances to the constitutional convention, and that convention, by a vote of 99 for to 14 against, granted the people of Ohio home rule, which was overwhelmingly adopted at the September election of 1912.
The people of Ohio’s municipalities believed that the long fight for municipal home rule had been won. They believed that at last they had gotten the political bread for which they had long been pleading. The question now is, Did they get only a brick, and that too of the gold variety?
What are the declarations in that home-rule amendment, Article XVIII?
I want to consider this amendment by sections, and I ask special attention to them.
*394 GENERAL ASSEMBLY, “HANDS OFF MUNICIPALITIES.”
This amendment, in my judgment, might well have been styled “General assembly, hands off Ohio’s municipalities.”
An examination of the several sections will disclose and demonstrate this fact.
“Section 1. Municipal corporations are hereby classified into cities and villages. * * * The
method of transition from one class to the other shall be regulated by law.”
For almost a century the general assembly had exercised the right of classifying municipal corporations. Many corporate abuses had resulted from the flagrant manner in which this classification had from time to time been made. This section expressly withdraws this right from the general assembly by a constitutional classification put into express words.
Here surely is a warning to the general assembly, “hands off!”
The cities of Ohio were thereafter to have “immunity” from classification by the general assembly.
“Section 2 [part 1]. General laws shall be passed to provide for the incorporation and government of cities and villages.”
This provision is substantially the same as that of the old constitution. It is admitted by all, however, that it relates simply to the form and method of government, rather than to any grant of power. The enactment of general laws by the general assembly under this part of Section 2 would apply *395 to a municipality*,of Ohio only until such time as a municipality would withdraw itself'from the general law, or exempt itself from the general law by the adoption of a charter under Section 7 of the home-rule amendment. (State, ex rel. Toledo, v. Lynch, 88 Ohio St., 71.) And when a municipality, by charter, withdrew itself from the general law, it would again be “Hands off!” to the general assembly. The city should then be free in'its municipal functions. Henceforth it was to be immune from general law, as decided in the Lynch case, supra.
Sections 4, 5 and 6 grant directly to the municipalities themselves all political power necessary to deal with public utilities. The broad circle of power herein granted is clearly comprehensive enough to include all kinds of regulation.
But even if it were not so, Section 3, which will be discussed later, is more than broad enough in the police power therein necessarily included to cover any phase or feature touching public utilities.
The remaining sections of Article XVIII are to the same effect, with the exception of Section 13.
Section 13 is strikingly significant. The part pertinent here reads as follows: “Laws may be passed to limit the power of municipalities to levy taxes and incur debts for local purposes, and may require reports from municipalities as to their financial condition and transactionsf’ etc.
The whole of Article XVIII, known as the home-rule amendment, under the heading of “Municipal Corporations,” deals at great length with powers of municipal corporations.
*396 But Section 13 is the only section permitting or allowing in any sense any limitation by the general assembly, upon the “municipal” powers of municipal corporations.
DIMENSIONS OF POWER APPEAR IN DEBATE.
The soundness of my position in this behalf clearly appears from the following debate in the Constitutional Convention, between Professor Knight, in charge of the home-rule amendment, and Judge Peck, one of the leading lawyers of the convention, both of whom rendered most distinguished and efficient service in that convention.
“Mr. Peck : I want to get back to this question .as to general government and local self-government. In section 7 you say that ‘any city or village may frame, adopt or amend a charter for its government, and may exercise, thereunder all powers of local self-government.’ What powers do you mean?
“Mr. Knight: All the powers of local self-government, subject to the limitations of section 12 [now Section 13].
“Mr. Peck : You don’t say anything about that ?-
“Mr. Knigpit: There is a specific limitation in section 12 [now Section 13].
“Mr. Peck: Point it out.
“Mr. Knight: Section 12 [now 13]: ‘The general assembly shall have authority to limit the power of municipalities to levy taxes and incur debts for local purposes.’ ”J 2 Constitutional Debates, 1451.
*397 From the foregoing course of reasoning, as well as the debate, which only confirms it, it clearly appears that no other limitation than Section 13 upon “municipal” power in municipal affairs was to be given to the general assembly.
The rule universally and unexceptionally recognized and applied is that “the enumeration of particular limitations presumes the exclusion of all other limitations.”
If the constitutional convention had intended any other limitation in supervising municipal power, Section 13 was the natural and logical place to put it. The absence of any such further limitation is therefore an unanswerable argument that no further limitations were intended.
Remembering now the decided purpose of the people of Ohio to abolish the old order and establish a new, as shown by their ten to one vote in 1910, remembering the general tenor and purpose of their leading amendments curbing and limiting the executive branch of the government, the judicial branch of the government and especially the legislative branch of the government, all for the purpose of safeguarding for themselves the people’s power and the people’s rights in their government, remembering especially their restraints and checks put upon the general assembly in Article XVIII, amounting in substance to “Hands off, general assembly,” we are brought face to face with Section 3.
SURVEY OF DECISIVE SECTION 3.
For convenience sake, Section 3 will be divided as follows:
*398 Part 1. “Municipalities shall have authority to exercise all powers of local self-government, and Part 2. “to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
It is admitted in the majority opinion that the answer to the one big question in this case is found in said Section 3. I accept the issue so made. What does this section mean — what rule shall we apply in ascertaining its meaning?
TECHNICAL RULES HAVE NO APPLICATION.
Judge Cooley, in his immortal work Cooley’s Constitutional Limitations (7 ed.), page 93, says: “Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be enabled to trace leading principles of government.”
Counsel for the telephone company admit in their brief: “The constitution should be liberally construed in respect to all governmental matters of purely local and municipal concern, so that municipalities may be unhampered in the exercise of powers legitimately covered by very general constitutional provisions.”
This new constitutional provision being intended to remedy old abuses is of course a remedial provision and all remedial provisions of constitutions or statutes must be liberally construed so as to carry out the intention of the makers and furnish the new remedy for the old abuse.
*399 It is apparent that part 1 of said Section 3 is in exceedingly general terms. Black on Interpretation of Laws, page 30 (citing cases), says: “Where the constitution grants a power in general terms the grant includes all such, particular and auxiliary power as may be necessary to make it effectual.” Applying these common sense rules of interpretation to Section 3, let us study its meaning and application.
The syllabus of the court in the present case entirely ignores the first half of Section 3. The majority opinion gives it mere passing notice; nowhere does it attempt to either define or describe it, much less to make any application of it. All it does is to make a mere declamation in the words of the section itself. This silence seems significant, equalled only by the silence of the Sphinx. Heretofore, it was presumed that the major part of the home-rule grant of power lay in this very part of Section 3 which is here so studiously avoided.
WHAT JUDGES SAID IN THE LYNCH CASE.
In the first home-rule case considered by this court, in 1913, State, ex rel. Toledo, v. Lynch, 88 Ohio St., 71, Judge Donahue in his concurring opinion said, at page 108:
“That part of Section 3 with which we are particularly concerned reads as follows: ‘Municipalities shall have authority to exercise all powers of local self-government.’ Certainly there is nothing obscure or uncertain in this language. It is so plain, concise and unambiguous that it affords no *400 ground for controversy and suggests no doubt as to its meaning.”
Judge Donahue, at page 112, continues:
“The fact remains that at the time of the adoption of this amendment municipalities were recognized as creatures of the state, possessing only such powers as the general assembly of the state chose to confer upon them; and it has been uniformly held, in Ohio at least, that municipalities had no power beyond the express powers granted to them by statute. It was this condition of affairs that this provision of the constitution intended to change, and this, I think, these amendments have accomplished. It would therefore follow that the provision of Section 2, authorizing the enactment of general laws for the government of cities and villages, and additional laws for the government of municipalities adopting the same, does not authorize the legislature to grant any powers to municipalities, or to expand the powers already granted by the people, or to fix any date or any condition precedent to the exercise of these powers. The grant of powers found in Section 3 is full, absolute and complete within itself. Therein is granted authority to exercise all powers of local self-government.”
Judge Shauck in the opinion for the court says at page 97:
“They [all powers of local self-government] are such powers of government as, in view of their nature and the field of their operation, are local and municipal in character.”
*401 Judge Wilkin in his concurring opinion says at page 100:
“The very purpose of the home-rule amendment is to lodge directly with the people of the municipality the authority to govern their local domestic affairs within the territorial limits of the city as they may choose.”
This clear, comprehensive grant of general power in part 1 of Section 3 has, strange to say, suddenly become very confusing and exceedingly restricted. If the first part of Section 3 was clear when the Lynch case was decided in 1913, what has happened to make it cloudy and confusing now ? If it was then the broad, general grant of governmental power indicated in those opinions, why should it be narrowed now to a mere shred of power? Why ignored in the syllabus and opinion? Why should part 2 of Section 3 in effect be permitted to destroy part 1 ? Why should the tail wag the dog?
Now it would seem self-evident that “all” powers means all powers. It surely does not mean “some” power nor “part” power. The constitution-makers are presumed to have used such simple words in their usual and ordinary meaning. They not only meant all powers in degree but all powers in kind. They evidently meant all powers included within the circle of governmental powers to successfully govern municipalities as such, to successfully conduct municipal affairs in the 20th century.
Therefore the grant of power in part 1 of Section 3, “municipalities shall have authority to exercise all powers of local self-government,” includes *402 all municipal powers .from A to Z, sufficient for efficient municipal government in all municipal affairs — all local self-government.
After making this grant of power to municipalities they evidently intended to add something by the use of the word “and,” by which they joined part 2 on to part 1 of said Section 3. “And,” is used to add, not subtract. It means more 'not less.
Now, what additional power did they give to cities by virtue of part 2 of Section 3 ?
Let us remember that there are three kinds of governmental power exercised in every municipality, (1) municipal, (2) state, and (3) national. We have already demonstrated, if it be possible to demonstrate it, that all municipal power, subject of course to Section 13, was granted directly to municipalities in their municipal affairs in part 1 of said Section 3. All municipal power having therefore been granted, part 2 cannot refer to municipal power because there was none left to grant, part 1 having already made the complete grant of municipal power. Part 2 therefore must relate to state or federal power. It is agreed it cannot relate to the latter, hence it must relate to the former — state power.
Now, what state power did they grant in part 2 ?
In the old Harvey and Holbrook grammars we were frequently told that in order to analyze or diagram a sentence we had to supply some missing words which, however, were clearly implied.
Let' us get back to some of those first principles and see how part 2 of this section will read when such words are supplied.
*403 First, part 1: “Municipalities shall have authority to exercise all powers of local self-government” and
Second, part 2: Municipalities shall have authority to exercise certain state power in local self-government, to-wit, “to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
I maintain that this preserves the full meaning of part 2 and only accentuates the distinction between part 2 and part 1 so as to give reasonable force and effect to each part of Section 3.
Naturally, when the municipality should exercise a state power, touching a subject-matter of the state upon which the state had legislated, it would seem sane and salutary that such local police, sanitary or other regulation should not be in conflict with the general law of the state touching that same subject-matter; that is to say, in the exercise of a state power the municipality should not say that a thing was lawful which the state at large through its general assembly had said was unlawful, neither should it say that a thing was unlawful which the state through its general assembly had said was lawful.
Being a function of state government it must have uniformity of operation, and in order to have such uniformity municipal regulation must not be in conflict with state regulation.
After ignoring the major grant of home-rule power to municipalities in part 1 of Section 3, after ignoring the definition and dimensions of this *404 grant of power, as shown by the opinions of various judges heretofore quoted, in accord with the plain purpose of the constitution-makers and adopters, the majority in this case take refuge in the tail end of Section 3 and use this minor grant of state power in part 2 to strangle and bleed to death the major grant of municipal power in part 1 of Section 3.
COURT IS CONFUSED.
The fatal error into which the court has fallen in this case comes from a confused conception of what police power actually is. The fatal fallacy is in the presumption that police power in Ohio is a state power.
Police power is a sovereign power of government. Centuries ago Louis XIV said: “I am the state.” The Kaiser to-day says: “I am the state — all the states.” But the people of Ohio have said in their constitution of 1851, and it is still in force: “We are the state.” —r- “All political power is inherent in the people.”
Now, when the people through their delegates met in constitutional convention they had the undoubted and • conceded right to delegate and distribute their sovereign power to whomsoever they pleased. They had the right to’delegate to the state such governmental powers as they pleased and they had a right to delegate to the municipalities such governmental power as they pleased, and to say that they did not intend to grant to the municipalities any police power is the veriest rot.
Everybody knows that if there is one place in the state and in the nation where police power is *405 more needed than any other place it is in the municipalities. It is hard to be patient or polite in exposing such a foolish fallacy as this proposition.
Probably we will understand it better if we undertake to define police power.
What is police power?
POLICE POWER DEFINED.
“Police power is the name given to that inherent sovereignty which it is the right and duty of the government or its agents to exercise whenever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires.” 8 Cyc., 863.
The police power, in effect, sums up the whole power of government. All other powers are only incidental and ancillary to the execution of the police power. Justice Day has discussed police power at length in Sligh v. Kirkwood, 237 U. S., 52, which case is often quoted by the federal supreme court as the best attempted definition of police power. He says at page 58:
“The limitations upon the police power are hard to define, and its far-reaching scope has been recognized in many decisions of this court. At an early day it ivas held to embrace every law or statute which concerns the whole or any part of the people, whether it related to their rights or duties, whether it respected them as men or citizens of the State, whether in their public or private rela *406 tions, whether it related to the rights of persons or property of the public or any individual within the State. New York v. Miln, 11 Pet. 102, 139. The police' power, in its broadest sense, includes all legislation and almost every function of civil government. Barbier v. Connolly, 113 U. S. 27. It is not subject to definite limitations, but is coextensive with the necessities of the case and the safeguards of public interest. Camfield v. United States, 167 U. S. 518, 524. It embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health. Chicago, &c., Railway v. Drainage Commissioners, 200 U. S. 561, 592. In one of the latest utterances of this court upon the subject, it was said: ‘Whether it is a valid exercise of the police power is a question in the case, and that power we have defined, as far as it is capable of. being defined by general words, a number of times. It is not susceptible of circumstantial precision. It extends, we have said, not only to regulations which promote the public health, morals, and safety, but to those which promote the public convenience or the general prosperity * * * And further, “It is the most essential of powers, at times the most insistent, and always one of' the least limitable of the powers of government.” ’ ”
Presuming that the delegates who formulated Section 3 understood something of the meaning of police power — understood something of the needs of municipalities — it is sheerest nonsense to say that they did not intend by the general grant of *407 power in part 1 of Section 3 to delegate the police power, without which municipal government would have about as much vitality as a graveyard. Such a thing is impossible to conceive.
COURT CONFUSED AGAIN.
Another trouble at the bottom of the majority opinion lies in their confusion as to part 2 of Section 3 in treating “police regulation” as synonymous with “police power.” All men are animals, but all animals are not men. All police regulations are included within the , police power, but all police power is not included within police regulation. They never were. They never should be.
Such confusion is almost incredible when we stop to think that the first half of Section 3 uses the word “powers” in its broadest, unlimited sense, while the same section in its last half uses the word not “powers” but “regulations.”
.How can this court say that these two terms are synonymous? If so, why didn’t the constitutional convention use the same word to express the same meaning in the second half of Section 3 that was used in the first half of Section 3 ?
The words “police regulation” instead of “police power,” as used in our Ohio statute law, relate entirely to a restricted or limited “state” power, while the word “powers” as used in the first half of Section 3 relates clearly and unquestionably to an unlimited and unrestricted “municipal” power, save as it is modified as to taxes and debts in Section 13. Indeed, the court’s construction resulting from this confused idea touching “all powers” and “police *408 regulations” is a surprise to itself, as appears from the following language of the opinion:
“If it were conceded that police power may be restricted to this narrow meaning in one instance and given a broader meaning in another, it must follow that police power in the larger sense of the term would include the narrower or restricted meaning.”
The opinion later continues:
“However that may be, there is no apparent reason whatever why the constitution should delegate to municipalities full authority to exercise police power in the broader sense of the term and then limit and restrict them in the exercise of local police power.”
Every reason in the world why. When the municipality ■ comes to exercise a “state” police power, as it does in part 2 of Section 3, it should be restricted by or conform with the general law. When it exercises “municipal” police power it should be absolute, unlimited and unrestricted. They are two entirely different kinds of power, the one relating to the municipality as a municipality and the other to the municipality as a political subdivision of the state.
Still apologizing for the unreasonable consequences of this construction, the opinion reads: “The exercise of local police power is of vital importance to large centers of population. If police powers may be divided along the lines suggested, it is of far more importance to municipalities that they should have authority to exercise local police power untrammelled by the general laws of the *409 state, than that they should have absolute right to exercise the police powers included in the broader definition suggested by counsel for the city of Cleveland, yet Section 3, Article XVIII of the Constitution, does limit and restrict municipalities to the exercise of local police power in conformity with the general laws of the state.”
This language is somewhat hazy and lacks the clear definition and distinction noted above between municipal police power that is inherently and essentially local to the municipality and the state police power within the municipality when it is regarded merely as a political subdivision of the state, in essentially state affairs.
The opinion later continues, still regretting:
“These limitations have been written into the constitution by the people of Ohio. Whether wise, or unwise, it is not within the province of a court to eliminate them upon the theory that municipalities shall have full authority to exercise police power, * * * . It may be possible to urge many good reasons why the home-rule amendment should not have contained these limitations upon the governmental powers granted to municipalities. The answer, however, is that it does contain these limitations,, and that courts must give them full force and effect.”
The opinion is strikingly silent upon another proposition emphatically essential to a correct understanding of the question; it nowhere undertakes to discuss or define “municipal affairs” or “local self-government,” which are, in substance, equivalent. Neither does it claim that the fixing *410 of rates of a public utility for a municipality and its inhabitants within the municipal limits is not a municipal affair.
If the court would have clearly defined a municipal function, or distinguished a municipal affair from a state function or state affair, it would not have been led into this indefensible error.
The word “municipality” has a history and etymology with which all students of government are reasonably familiar. It comes from the old Latin word “municipium ” which meant a free city, having the sovereign right to local self-government. However, in that city was exercised not merely the government of the municipality as a municipality, but the government within the municipality as a part of or a political subdivision of the state. This fact is in no wise even considered in the opinion of this case.
There would be no confusion at all if the court would treat the municipality as a merely incorporated community, directly and expressly con- • trolled and governed by the first half of Section 3, and the municipality as a political subdivision of the state controlled and governed by the last half of Section 3. That gives immunity to the municipality as a municipality, and uniformity or conformity to the general laws of the state when considered as a political subdivision of the state. This gives reasonable force and effect to the whole of Section 3 and in full accord with the intention of the constitution-makers and the constitution adopters.
*411 POLICE REGULATIONS DEFINED.
In order to not merely declare but to demonstrate that the words “police regulations” as used in the laws of Ohio had a well-defined meaning and use in connection with the statute law of Ohio, I want to adopt the language of Judge Johnson in the case of Fitzgerald v. City of Cleveland, 88 Ohio St., 359:
“Concerning the provision in Section 3, Article XVIII (may adopt such local police, sanitary and other similar regulations as are not in conflict with general laws), the general laws referred to are obviously such as relate to police, sanitary and other similar regulations, and which apply uniformly throughout the state. They involve the concern of the state for the peace, health and safety of all of its people, wholly separate and dis- ■ tinct from, and without reference to, any of its political subdivisions — such as regulate the morals of the people, the purity of their food, the protection of the streams, the safety of buildings and similar matters.
“Manifestly, therefore, it was necessary, when the constitutional convention was conferring all powers of local self-government on cities,, to provide that, in the adoption of such regulations by any city for itself (police, sanitary and similar ones), they should not conflict with general laws on the subject.
“It is a well-settled rule1 that the body adopting amendments, such as are here involved, will be presumed to have had in mind the course of legisla-
*412 tion and existing statutes touching the subjects dealt with. People, ex rel. Jackson, v. Potter, 47 N. Y., 380, and cases cited. The legislature of Ohio in the codifications adopted by it, covering many years, including the last one adopted, has included a separate title, designated by it Police RegulationsJ in which it has included the general laws of the character we have above described. If it had been intended that the limitation should comprise the wide and elastic scope contended for, it would have been so expressed.”
I desire to supplement and reinforce this definition of “police regulations” appearing in the opinion of Judge Johnson, by calling attention to the fact that in 3 Page & Adams’ Annotated Ohio General Code, page 209, a schedule of “Police Regulations” appears as a part of the Ohio statutes, properly and particularly classified and scheduled, which statutes were in general use and circulation among the members of the Constitutional Convention, the profession and the public. In that schedule of “Police Regulations” appears the words, adulterations, animals, auctions, butter and cheese factories, cigarettes, explosives, gaming, grist mills, innkeepers, inspection, intoxicating liquors, labor, mobs, motor vehicles, pawnbrokers, peddlers and itinerant vendors, shows, trading stamps, etc., in all some thirty-four different specifications of “Police Regulations.”
This was, and for many years had been, the meaning and use of “Police Regulations” at the time the constitutional convention met, and the members thereof plainly and pertinently realized *413 that there was no essential difference in principle as to regulations touching these and similar subjects in the country districts or city districts. Pure food free from adulterations was quite as important to the country districts as the city districts. Cigarettes and explosives should be regulated and safeguarded as well within as without corporate limits. Labor and motor vehicles likewise.
The words “Police Regulations” not only appear in the Page & Adams’ General Code, but also appear as early as 1880 in the so-called Williams’ statutes, and later in Bates’ Revised Statutes, Vol. 2, Title V, published in 1897, fifteen years before the constitutional convention met.
It would seem that this long use and understanding of “police regulations,” as used in the statute law of Ohio, would remove all doubt as to the meaning and use of these identical words by the constitutional convention.
Dealing with subjects of such great variety and of such vital importance to all the people of Ohio, the constitution-makers naturally and wisely provided that these state-wide “police regulations,” embracing the general laws of Ohio from Section 5774 to Section 6441, General Code, should be saved to the state for operation within, as well as without, municipalities.
That this was the limited and restricted use of the words “police regulations” further appears from the insertion of the word “sanitary.” If the contention in the majority opinion is sound (that “police regulations” is here synonymous with “police powers” as embraced in the first half of *414 Section 3, part 1), then it was wholly unnecessary to use the word “sanitary,” for the most superficial student of law and government knows that police power always has included sanitary or health regulations.
Again, the use of the words “other similar regulations” corroborates this limited and restricted view of the words “police regulations” because these words were wholly unnecessary if the word “police” was here used in its general and familiar sense.
Now, if I am right that the use of the words “police, sanitary and other similar regulations,” in part 2 of Section 3 of the home-rule amendment, is a limited and restricted one, following their statutory schedule and scope as found in Page & Adams’ Code, supra, and that this was the only use of these words known in either constitution or statute of Ohio, then surely the scope of that schedule “Police Regulations,” the word “sanitary” and the words “other similar regulations,” neither one nor altogether, is broad enough to include a rate-fixing power. It is preposterous. Rate-fixing has been frequently said by courts to be the exercise of a police power. It is more properly the exercise of a proprietary power, the same as every proprietor exercises over his own property. He may use it himself, or he may fix the terms upon which anybody else may use it, or fix the price which third persons may receive for using it.
Bared to the bone, the distinction between these two parts is as follows: part 1 provided for immunity of municipalities from general law in their *415 own municipal affairs in local self-government, while part 2 provided for uniformity of general law throughout the state in all the political subdivisions thereof, towns, townships, cities, villages and the like. It was imperatively necessary that there should be this uniformity of operation of general laws because the constitution expressly required it.
These two doctrines, immunity in part 1 from general law and uniformity of general law in part 2, are entirely consistent, and the only consistent interpretation of the whole of Section 3.
That this is the natural and clearly intended meaning of this Section 3 appears from the address of the constitutional convention, issued to the voters at the time the amendment was adopted, September 3, 1912:
“Cities and villages under the proposed amendment are given the right to frame their own charters, own and regulate their own public utilities and to adopt by ordinances such local police, sanitary and other similar' regulations, not in conflict with general laws, as they may deem necessary. To the general assembly is specifically reserved the authority to limit the power of cities to levy taxes and incur debts for local purposes, to control elections, to examine into the financial condition and transactions of all municipalities, and, by general laws, to make such provisions for police and sanitary regulations and other similar matters as may be for the general welfare of the state.”
Not “the general welfare of a city,” but the whole state.
The majority opinion contains this language:
*416 “It is hardly within the range of possibility, much less probability, that the people of this state intended to vest in the many municipalities of Ohio discretion to exercise unlimited and unrestricted police power.”
Here again you have an absolute failure to realize that police power may be municipal as well as state. Municipal power is unlimited in the first half of Section 3, (see Judge Donahue’s opinion, supra), except by Section 13.
The state police power is exceedingly limited by the last part of Section 3. The absence of limitation in the first half and the presence of limitations in the second half are entirely consistent. Why should not the people of a city know much more about running their own local affairs than some board or commission in Columbus? It was in the community life of the nation where democracy had its birth. Local government is constantly in touch with its people. Why should not" the people have the power to govern themselves ? For, be it remembered, we will never get government for the people until we get government by the people.
The case of State, ex rel. Toledo, v. Cooper, 97 Ohio St., 86, is cited in support of the majority opinion. It has no application, since it is limited not by Section 3 but by Section 13 of Article XVIII. This is too apparent for argument.
The other cases cited in the majority opinion fall into one of three classes:
1. Either the right of home rule was not raised in the case, or
2. The city had no charter, or
*417 3. The police regulation in question was inherently and essentially such as was contemplated in the statutes referred to as “police regulations” in the General Code of Ohio.
In any event, they have no pertinency in this case.
Inasmuch as it has been admitted throughout the majority opinion that the case must stand or fall upon Section 3 of the home-rule amendment, it is unnecessary to consider Sections 4, 5 and 6, dealing with municipalities, except to say that these various sections taken together clearly recognize the right of municipalities to own and operate their own public utilities, and inasmuch as the greater must include the less they clearly would have the right to regulate any privately owned utility, or at least fix the terms and conditions upon which it should operate within the city.
The matter quoted from the constitutional debates purporting to be a statement by Mr. Harris, of Hamilton county, chairman of the committee, has nothing in it inconsistent with the debates quoted herein between members Peck and Knight.
The application in the majority opinion sought to be made of Section 2, Article XVIII, as to the creation of boards and commissions, being in general terms, cannot be held to nullify a more specific provision under Article XVIII applying to municipal governmental power. The more specific provision controls as against the more general.
The argument as to the understanding and construction given the utility commission act by the cities of Ohio for some three or four years hardly *418 deserves notice. That sort of argument, in favor of the bogus classification of cities, was invoked in this state for over half a century until finally after a long and vigorous fight it was overruled by this court in the Cleveland and Toledo cases in 1902.
The fact of the matter is that now is the first time this question of rate-fixing has been directly and squarely before this court.
The case of Stange v. Cleveland, 94 Ohio St., 377, relates to a labor regulation clearly within the schedule of police regulations and there itemized as such.
Likewise the case of City of Fremont v. Keating, 96 Ohio St., 468. The subject-matter there was a motor vehicle, and that too is expressly itemized in the schedule of police regulations.
The majority opinion states that the city is not • an illustration of imperium in imperio and cites the case Billings v. Cleveland Ry. Co., 92 Ohio St., 478. Strictly and technically speaking the opinion is correct. Metaphorically and politically speaking the opinion is wrong.
We have used this phrase in regard to the state government within the federal government and it was once a part of the great seal of Ohio, and exactly as the state government is sovereign in state affairs, though a part of the nation, so the municipal government is sovereign in municipal affairs, though a part of the state, save as it is limited by Section 13 of Article XVIII.
The parent case under the home-rule amendment is State, ex rel. Toledo, v. Lynch, 88 Ohio St., 71, *419 where it was presumed this court had decided something.
That case was very thoroughly briefed by a large number of able and distinguished counsel, was very thoroughly argued, and long and carefully considered by the supreme court.
Judge Shauck, after the most thorough and painstaking consideration of the question involved, and he will not be regarded as excessive in his zeal for the amendment, used this language touching the home-rule amendment:
“This article provides two modes of securing the permitted immunity from the operation of the uniform laws which the legislature is required to pass. One of them is defined in the second section, and manifestly it is not self-executing, for it expressly authorizes the legislature to pass 'additional laws,’ that is, laws additional to the general laws which the legislature is required to pass, such additional laws to become operative in a municipality only after their submission to the electors thereof and affirmance by a majority of those voting thereon. The other mode is defined in the provisions of the later sections relating to the adoption of charters.”
It is significant that neither in the syllabus nor in the majority opinion in the instant case is any reference whatsoever made to this “immunity,” as discussed and decided in the Lynch case, but all cities and villages are regarded as subject to all police power generally, whenever the legislature sees fit to exercise it in the shape of a general law.
Cleveland adopted a charter and therefore claims *420 as a matter of right, under the Lynch case, its “immunity” from legislative interference by the state in its own municipal affairs. The absolute silence of the majority opinion as to the Lynch case shows its studied effort to plow around this holding of the supreme court of Ohio, in which judgment there concurred Judges Shauck, Newman, Wilkin, Johnson and Donahue, some for one reason, some for another.
Judge Donahue further laments the doctrine in Judge Shauck’s opinion in Lynch case, supra, and declares his fidelity to home rule in the following language, at page 111 of his concurring opinion:
“This is in line with the former proposition as to general laws, and I do not care to discuss it further, except to say that if either this or the former construction is to obtain, then the municipalities are still dependent upon the general assembly of the state to measure out to them their power and authority to control their own local affairs, and Section 3 of Article XVIII might just as well never have been written. Undoubtedly it was the intention of this article to change the existing condition of affairs and grant to municipalities directly the authority to. exercise all powers of local self-government”
When did telephone rates within the city of Cleveland, and for the people of Cleveland, cease to be embraced within the words “local affairs ?”
And when, pray, did the “intention of this article to change the existing condition of affairs and grant to the municipalities directly the authority to exercise all powers of local self-government” *421 change so as to vest in the state all the police power needed for the municipality ? It was a state power before the amendment; the municipality had only such as the general assembly saw fit to delegate to it. But clearly it was the intention of the amendment, as indicated in the quotation above, to make the grant direct to the people of the city as to all police power in any and every degree necessary for “local self-government.”
The Lynch case is fundamental upon the proposition of the “immunity” of municipalities from general laws, which proposition is wholly disregarded in the case at bar.
The next important case construing the same Section 3, Article XVIII, is that of Billings v. Cleveland Ry. Co., 92 Ohio St., 478. This case, to my mind, is controlling and decisive of the principle involved here. The city of Cleveland by virtue of its charter granted the right to a street railway company to construct its tracks in Euclid Avenue, without the consents of the majority of the property owners, as provided in Sections 3777 and 9105, General Code. An abutting property owner upon this street, objecting to the railway company locating its tracks in Euclid avenue, sought to enjoin the company from the construction of such track, by reason of the fact that it had not complied with these sections. In the Billings case this court held that these statutes were of no effect in a city that had adopted a charter, where the charter had provided expressly that no such consents were necessary.
In short, the court held that the city of Cleveland *422 was entitled to “immunity” from the general law, by reason of the home-rule article and the charter adopted pursuant thereto.
The first paragraph of the syllabus in that case reads as follows:
“The granting of permission and the making of a contract to construct and operate a street railway in the streets of a city or village is a matter that may be provided for in a charter adopted by the municipality under Article XVIII of the Constitution.”
Manifestly if the charter may provide for it, then such charter may conflict with the statute touching the same matter. Both cannot control. But the Billings case holds that the charter controls. Why ? Because the power of the city is being exercised with reference to “municipal affairs,” or to matters of “local self-government.” The members of this court concurring in that judgment were Chief Justice Nichols and Judges Johnson, Donahue, Wanamaker and Matthias.
Now, the same doctrine that applies to street railroads in the use of the streets and public highways of a municipality must of necessity apply to a telephone company in the use of the streets and public highways of the city. They are both transportation agencies, they both must obtain a franchise from the city, they both are public utilities, they both are essential to an indispensable public service, and in all substantial respects are analogous in their relation to the city.
The lines of both extend beyond the city. A part of the business of both is extra-territorial, includ *423 ing Cuyahoga county, including the main thoroughfares of the state; indeed it may be interstate.
I am frank to confess that I cannot understand the difference in principle between a steel rail within the city that may extend without the city and a steel wire within the city that may extend without the city, both used for transportation services.
If the city may regulate the steel rail within the city as to the price for transportation of men, I cannot understand why it may not regulate the steel wire within the city and the price for the transportation of messages. It is too- much like tweedledee and tweedledum.
The majority -opinion undertakes to avoid the controlling effect of this decision by claiming that “The grant to a street railway company of a right to lay its tracks in the streets, does not involve the exercise of police power, but is solely and only a governmental function.”
This is a distinction without a difference. All police power is a governmental function and 95 per cent, of governmental functions is in the exercise of the police power, which according to the definition of Judge Day in the Sligh case, supra, is as broad and long, as deep and high, as the public welfare.
To say the least the language quoted is exceedingly loose. If the regulation of streets and highways, or any other public or private property, as to its uses and abuses, is not police power, in the name of common sense what is it?
It is of course impossible to note all of the errors of fact and judgment, so apparent in.the majority *424 opinion, but one more is so characteristic of its recklessness in reason that I shall give more than passing attention to it. This language appears in the opinion:
“This section [Section 2, Article XIII] was adopted at the same time that Article XVIII was adopted. There is therefore no theory upon which it can be claimed that Article XVIII repeals by implication any provisions of Section 2 of Article XIII. On the contrary, the presumption obtains that both of these provisions should be given full force and effect; yet if Section 3 of Article XVIII is to be given the construction contended for by counsel for defendant in error, it would practically destroy the provisions of Section 2 of Article XIII.”
I concede that such constitutional construction should be adopted that “both of these provisions [Section 3, Article XVIII and Section 2, Article XIII] should be given full force and effect.” But I hold this doctrine applies not only to these provisions of the constitution, but to all provisions of the constitution.
If the majority had applied this rule to both parts of Section 3, they would not have held that the minor grant of “state” power, with the limitation “not in conflict with general law,” as found in the last half of Section 3, defeated or bled to death the major grant of “municipal” power absolute and unlimited in part 1..
The majority view in effect destroys the general grant of sovereign power in municipal affairs by unreasonably and unnaturally expanding the lim *425 ited grant of state power in part 2. Under the doctrine last quoted from the majority opinion, it is another case of Hainan’s scaffold.
But does the construction I contend for destroy Section 2, Article XIII ? A reading of the section discloses exactly the contrary. The pertinent part is as follows:
“Corporations may be classified and there may be conferred upon proper boards, commissions or officers, such supervisory and regulatory powers over their organization, business and issue of stocks and securities, * * * as may be prescribed by law.”
The word “corporations’* is the broad generic term and includes all private corporations, those for profit and those not for profit. The corporations referred to are as broad, numerous and varied as our industrial, business and commercial life. Included therein are, of necessity, all steam and interurban railroads, telegraphs, telephones, manufacturing corporations of every kind and variety, as well as public utilities.
Now, what is withdrawn from the state’s broad control under Section 2, Article XIII? Merely the public utilities that are wholly within a municipal corporation, and, therefore, within the home-rule powers embraced within “local self-government.”
The major part of the “supervisory and regulatory” power over the “organization, business, issue of stocks, securities,” etc., of all corporations is still saved to Article XIII. So that instead of Section 2, Article XIII, being destroyed by this sec *426 tion, it is obvious that but a small percentage of its jurisdiction would be withdrawn in behalf of municipal home rule and regulation.
A little more of the acid test. The legislature cannot delegate to the commission a governmental power it did not possess. Therefore, suppose the legislature had passed an act fixing the telephone rates or the street car rates, water rates, or the rates of any other public utility, for the city of Cleveland, would anybody be absurd enough to say that such act would become operative upon the city of Cleveland merely because the legislature had passed it ?
No, it would be an “additional law” needing a favorable referendum before operation.
VIOLATION OF RIGHT. OF REFERENDUM.
One thing the constitution-makers sought to safeguard above all others in the field of legislation, whether for the state at large or the municipalities, was the right of referendum. This they expressly and specifically wrote into the amendments of 1912. In the most insidious way and by the most effective indirection the general policy of “commission” government invoked in this case is, by its special and local operation in the municipal affairs of the cities of Ohio, the clearest violation of the people’s right of referendum as to matters pertaining directly to their own government. What the legislature could not do directly it accomplishes indirectly by the creation of a commission. The legislative act is subject to the *427 referendum. The commission act is wholly free from it.
Abroad we are fighting for democracy, to defend it for the nation and the world. At home we are fighting against democracy, to defeat it for the cities and villages of Ohio. I shall leave it for others to show the consistency between our position at home and abroad. If home rule be a good thing for Belgium, for Servia, for Bulgaria, Poland, Roumania and Ireland, it would seem by parity of principle that it ought to be a good thing under our constitution for Ohio’s cities and villages, and it was so intended.
Democracy should not only be a good thing for the dictionary, the encyclopedia and the text book, not only good for the Fourth of July, but should be a good thing for practical government 365 days in the year.
The battle of Bull Run for democracy in Ohio cities and villages has been fought and lost, as it was fifty-seven years ago. But the war for democracy in Ohio’s cities for home rule, for government by the people, has just begun.
I have gone into this subject at so great length in order to gather together the various views and arguments supporting the home-rule position, having been for many years an advocate of this . first principle of democracy, community democracy, democracy where it was first born.
I submit these views to a candid people, indulging the hope that the majority opinion shall not become the settled law of Ohio, but that a reconsideration upon the part of the public, as well as the bench *428 and bar, shall lead to a reversal of the undemocratic, un-American, unconstitutional doctrine announced in this opinion.
Unless this be done, there is nothing left but the shell of home rule in Ohio. The soul and spirit of it has been by this court transferred by a process' of legal legerdemain back into the hands of the general assembly, from whom the constitution-makers believed they had entirely and eternally divorced it.